185 So. 269

**STATE v. McMILLAN.**

No. 35095.

Nov. 28, 1938.

Prowell & McBride, of New Orleans, for relator.

Charles A. Byrne, Dist. Atty., and Charles W. Kehl, and J. H. Wiener, all of New Orleans, for respondent.

ODOM, Justice.

Mary Carol McMillan is a female child, four years old. Her parents both reside in New Orleans and are living apart, though neither has applied for separation from bed and board, or divorce. On September 21, 1938, the following affidavit was filed in the Juvenile Court:

"Affidavit Against Child

"State of Louisiana     Parish of Orleans
"In the Juvenile Court of the State of Louisiana

"The State vs Mary Carol McMillan (4 yrs) at large     No. 60578

"Before me, Chas. F. Degan, Deputy Clerk of the Juvenile Court of the Parish of Orleans personally appeared Clarence J. Kerber, information received who, having been sworn, did depose and say

"That Mary Carol McMillan, 4 yrs. being under the age of seventeen years, and within the jurisdiction of the Juvenile Court of the Parish of Orleans, is a neglected Child, in that, on the 21st day of

September 1938 within the jurisdiction of said Court, was then and there in without proper parental care or guardianship—parents, separated contrary to the form and statute in such cases made and provided.

"Sworn to and subscribed before me this 21st day of September 1938

"Clarence J. Kerber

"Chas. F. Degan Deputy Clerk"

There is nothing in the record, which was sent up to this court in obedience to our order, to show that the case was set for trial. But, according to the report of the case made by the court reporter, we find that on October 10, 1938, the father of the child, Mosely W. McMillan, and his attorney; the mother of the child, Mrs. Lorena McMillan, and her attorney, were all in court. Apparently there were a number of others present in court. One of them was the Reverend B. E. Massey, who resides in Mississippi. He is the foster father of Mrs. Lorena McMillan, the mother of the child.

Whether there are any set rules of procedure in the Juvenile Court of the City of New Orleans does not appear. But from the record it appears that the proceedings in this case were very informal. For the purpose of our decision, we take the record as we find it.

The juvenile judge questioned the father and ascertained from him that he had carried the child to the State of Mississippi and there placed her in the care and custody of his sister, and that the child was then in that state. He asked the mother whether she had made the affidavit in this case, and she replied that she

had. The affidavit in the record shows that it was made by Clarence J. Kerber. We infer, therefore, that the affidavit was made at the request of the mother. The judge also questioned the Reverend B. E. Massey as to the whereabouts of the child and as to his efforts to obtain her custody. None of the parties questioned by the judge was sworn.

The record as brought up contains the questions propounded by the judge to the witnesses, as well as their answers. It also contains numerous voluntary remarks and assertions made not only by the father and the mother but by their attorneys. As we said, the proceedings seemed to be very informal, and apparently all such testimony as the judge brought out and all the voluntary remarks and statements made by the mother, the father and the attorneys were taken down and transcribed by the reporter. The testimony, the voluntary remarks and statements all clearly show that there is nothing involved in this proceeding except a controversy between the father and the mother as to which of the two should have custody of the child.

To illustrate, the mother of the child interrupted the proceeding by asking: "Is is right for him"—meaning the father—"to take the child away from me, and she is gone for three weeks, and I don't know who has the child?"

And again she remarked, "He does not have custody of the child". Again, during the colloquy which took place in open court between the judge, the lawyers and

the mother, the father remarked, "I would rather have the child myself".

The judge suggested that it might be well to place the child in the temporary custody of the Reverend B. E. Massey pending the final outcome of the case, whereupon the attorney for Mr. McMillan said, "No, I am afraid that Mr. McMillan would not agree, because he is afraid that the wife would come and get the child from Rev. Massey". The judge asked the Reverend Massey whether he had ever made an effort to get custody of the child, and he said:

"Not more than to make this suggestion: We had been trying to get custody of the child. He (referring to the father) is a fine gentleman, and is well able, and I will follow just whatever he says. I told him I would take the child with the understanding that both of them could come and see the child, but that the child couldn't be taken away without our definite consent for someone to be in company of the child, because one would feel that the other is getting more privilege than the other."

The record shows beyond question that the child is not "neglected" as that term is used in Act No. 126 of 1921, Ex.Sess., which creates the Juvenile Court and regulates the proceedings therein. Section 3 of that act defines a neglected child as follows:

"The term 'neglected' child shall mean any child seventeen years of age and under, not now or hereafter inmates of a State Institution, found destitute, or dependent on the public for support, or without proper guardianship, or whose home, by reason of the neglect, cruelty, depravity or indigence of its parents, guardians, or other persons, is an unfit place for said child, or having a single surviving parent undergoing punishment for crime, or found wandering about the streets at night without being on any lawful business."

It is conclusively shown that Miss McMillan, who, at the time of the proceeding, had physical custody of the child, is a most excellent lady. The Reverend Massey said he knew her personally and that she was one of the finest Christian characters he ever knew. No one seems to doubt that she will take the best of care of the child. It was further shown that the father of the child is regularly employed by a railroad company as storekeeper with a salary of $280 a month and is therefore amply able to provide for the child's support, and further shown that he is actually providing the means for her support and is visiting the child regularly.

The parents are living apart but are not separated from bed and board, or divorced. Article 216 of the Revised Civil Code provides that:

"A child remains under the authority of his father and mother until his majority or emancipation.

"In case of difference between the parents, the authority of the father prevails."

In State ex rel. Herbert v. Renaud, 157 La. 776, 103 So. 101, this court said [page 102]:

"This court has repeatedly recognized the paramount right of the father to the

custody of his minor children, unless it is proven that he is disqualified by unfitness to have such care and control, and this right of the father, in controversies between the spouses, among themselves, or with third persons, has been uniformly enforced through writ of habeas corpus issued by the district courts of the state."

The affidavit sets out that the child is "neglected"—"without proper parental care or guardianship—parents separated".

There is nothing that shows, or even indicates, that the child is neglected in the sense that she is destitute, dependent on the public for support, or without proper guardianship, or that her home, by reason of neglect, cruelty, depravity or indigence of her parents or other persons, is an unfit place for her (Sec. 3 of the Act). In fact, the question whether the child is neglected in the legal sense soon passed out of the case, and the proceeding developed into a controversy between the father and the mother as to which was entitled to her custody.

Under such circumstances, the juvenile judge should have dismissed the proceeding for want of jurisdiction. In this connection, it is well to state that neither the father of the child, nor anyone else, is charged with contributing to the neglect of the child. It is charged that the child is neglected.

We infer from the various remarks made by the judge from the bench, and from his written reasons for making such rulings as he did, that he is of the opinion that he has jurisdiction to deter-mine the question as to who is entitled to the custody of the child. In view of the fact that it is perfectly evident that the child is not "neglected" in the legal sense, the Juvenile Court has no jurisdiction to determine that question. There is only one condition under which the Juvenile Court has jurisdiction to determine the question as to who shall have custody of a child. That is set out in Section 7, Act No. 126 of 1921, Ex.Sess., which provides for proceedings in the Juvenile Court for the Parish of Orleans and which defines the jurisdiction of said court.

Section 7 provides that:

"Whenever a child shall be found to be neglected within the meaning of this Act, the court may commit it to the care of some institution or to some citizen of good moral character or to some association or institution embracing within its objects the care of neglected children."

It is perfectly evident that unless and until a child is found to be neglected the Juvenile Court has no jurisdiction as to its custody.

In the case of In re Owen et al., 170 La. 255, 127 So. 619, we said [page 622]:

"The line of demarcation between the courts exercising general civil jurisdiction with respect to the care, custody, and control of minors and the juvenile courts is well defined. These courts, in dealing with the welfare and interest of minors under a given age, are entirely independent of each other. Where the contest is between the parents, or between a parent

and a third person, as to who should have the control and care of the minor, the court exercising general civil jurisdiction is the proper and exclusive tribunal to decide the issue."

To the same effect are the following cases: In re State in re Oswald, 177 La. 1007, 150 So. 1; Brana v. Brana, 139 La. 305, 71 So. 519; Buffington v. Goldman, 152 La. 647, 94 So. 147, and State in Interest of Bolin v. Bruce, 178 La. 1081, 152 So. 911.

The record shows that the judge placed the child in the temporary custody of the Reverend B. E. Massey, who lives in the State of Mississippi. He ordered the Reverend Massey to bring the child to court on November 3, the date set for the trial of the case on its merits. He ordered the father to produce the child on that date, and, to secure obedience to his order, he ordered the father arrested and placed under a $1,500 bond.

All through the proceedings the father, Mosely W. McMillan, insisted that the court was not vested with jurisdiction. After the court issued the above orders and announced that he would proceed further with the case on November 3, 1938, the father applied to this court for writs of certiorari, mandamus and prohibition, which were granted, and the record was sent up in obedience to our order.

While the case was not formally tried on its merits, yet the merits were sufficiently gone into by the judge to disclose that the child was not in fact neglected. He therefore had no further jurisdiction. Our conclusion is that the entire proceed-ing should be quashed, and that the father should be released from arrest.

For the reasons assigned, the preliminary writs heretofore issued herein are made peremptory, and the judge of the Juvenile Court is prohibited from proceeding further with the case; and it is further ordered that all such orders as he issued on October 10, 1938, be, and the same are hereby, annulled and set aside, and that the entire proceeding be dismissed.